310810, Conrad Harrison of Congress reporting here. Judge Michael Addington, et al. and Louise Zaganis, still. Counsel. Good afternoon, Your Honor. May it please the Court. Counsel. We are here on an appeal from an order granting summary judgment to seven of the eight defendants in an interference with employment claim, intentional interference with employment or prospective business advantage, and a defamation per se claim made against a number of the individual defendants in the case. The Court found in its September 14, 2010, order that we had not shown sufficient facts to create an issue of material fact as to the existence of malice on the part of the individual defendants who were all dear managerial employees who we allege interfered with the continued employment of Mr. Harrison by recommending that he be fired. Mr. Harrison had a reasonable expectation in continued employment with Deering Company based on his performance. The record is clear here that he was a good managerial employee who continued to be promoted through the ranks up until this incident occurred beginning August 31, 2010. Then within two days, he was terminated based on the recommendations of three managerial employees, Myrtle Hornbuckle, Sherry Martin, and Mike Addington. The problem became in ruling on the summary judgment motion that the Court's accepting every version of facts in the light most favorable to the defendants in this case. We are accepting one version of facts is that he was terminated for the electronic use policy. Well, that was Mr. Addington's version of the facts. Ms. Martin said we didn't even talk about in this September 2, 2009 meeting any violations of policies. We terminated him for violation of the how, how we operate, and we are not condoning our managerial employees having personal relationships with subordinates. That's why we terminated him. Myrtle Hornbuckle says we terminated him because we had developed over time this zero tolerance best practice which states that any married managerial employee engaged in an extramarital affair with another managerial employee will be terminated. Those are three materially different explanations of facts as to why he is being told they're telling the decision maker, Dave Everett, to fire him. And what business do any three of these managerial employees have in this? None of the relationship between Mr. Harrison and Ms. Theabert that was the quote subject of the investigation as admitted by the defendants in their reply brief had anything to do with conduct that occurred in the workplace. To then claim and bootstrap that into a recognized best practice that prevents or has a zero tolerance for this type of behavior. Let me ask you, you represent individuals often against corporations. How would you like to have a sexual harassment claim against a company? An employee says she was sexually harassed and you look and you saw that the company knew that this employee that was now being accused of sexual harassment had had affairs with a number of his subordinates at work. Well, that's not the facts in this case, but once the invest, we're not complaining that they looked into it. We're complaining that they recommended and it resulted in the termination when they found out by September 1st that this was a consensual relationship that wasn't the subject of any sexual harassment. Ms. Theabert was interviewed by Mark Dainey and Mark Dainey. It states in the report that she said that this was consensual. Well, but at the end of the day, I mean, you're not suing gear here for the fire, correct? That's correct. Well, that's, you know, with respect to the interference with employment, were they malicious? Were they unjustified? The case, Falhauser and HPI say we do not, those are both Supreme Court cases, both say that we don't have to prove actual ill will. All we have to prove for the allegation of malice is that their conduct is not justified. And it's not justified to recommend the termination of a senior manager at a gearing company based on your own belief that it's improper for him to have engaged in a consensual relationship with a, actually a non-gearing employee, a Volt Services employee, and make that recommendation to another senior manager based on no existing written policy. They created this out of whole cloth here. They said we can fire him because we don't like the fact that he's having an affair. Well, he was separated from his wife at the time, getting a divorce, and the investigation showed that none of the conduct between Mr. Harrison and Ms. Theabert occurred at the workplace. Was your client an employee of Will? Yes. Well, couldn't they, couldn't his superior recommend to his superior, you fire that guy, I don't like the socks he wears. Well, they didn't do it on that basis. Well, then there is no such thing, Your Honor, as an interference with employment expectancy case in Illinois, if that's the case. Here, we're showing the facts that say there's a question of material fact that this was unjustified to recommend the termination of an employee based on his off-work conduct that doesn't affect the employer's workplace. Period. In Section 9 of the Illinois Personnel Records Review Act says an employer isn't to keep track of people's personal associations and off-work activities unless the employer can show that somehow it's impacted the employment setting. And that doesn't happen here. They didn't say to Mr. Everett in the recommendation that he be fired that Mr. Harrison's relationship here with Heather Theabert conducted off-hours somehow adversely affected the property or financial interest of Deere Company. Aren't they privileged to seek information regarding a possible sexual harassment case? Oh, yeah, and we have no problem with that. Many of those cases, it depends on the timing, whether or not someone alleges it's consensual or it's sexual harassment. And companies are very, you know, in the last 25, 30 years, this isn't something new that's come up. Companies are very acutely aware of these kinds of cases, are they not? Correct, but when you find out on September 1st that there is no allegation of sexual harassment whatsoever from the alleged victim herself. But that isn't what starts this investigation, is it? The start of it, like Alyssa Maddox's father contacts somebody and says, if he comes out here, I'm going to, or what's going to happen if I beat him? My daughter, Sean Maddox, who was the subject of a different claim, falsely accused my client of raping his daughter and then tagged into that, oh, and by the way, he's also sexually harassing Heather Theabert. Well, Deere says investigate this, but they say that they're steering clear of the claim of the rape and they're only going to focus on the Heather Theabert relationship with Mr. Harrison. We've cited in our brief that we believe that the record shows that Mr. Digny continued to focus on what he was not supposed to, namely allegations that Mr. Harrison allegedly raped this woman, which was not true. But then you have the continuing basically poisoning of the well for Mr. Harrison in the workplace when his supervisor and second level supervisor are both repeating to management that there's a warrant out for his arrest. That's defamation per se. To accuse somebody falsely of a crime and that they're subject to arrest is defamation per se. And they're claiming that there's a qualified privilege to do this based on the fact that they were just reporting what was said by Mr. Maddox. Well, we've cited to the record in particular that Mark Digny in his report said that Harrison had a warrant from his arrest. And when I asked him, where'd you get this information? That was from Jim Olson and Dave Duvall. Did you tell Jim Olson that Maddox had alleged that the assault was reported to local law enforcement and that Harrison had a warrant for his arrest? Yes, I did. Well, under the decision to determine if a qualified privilege exists in that situation, the court looks to the occasion itself for the communication and determines as a matter of law and general policy, whether the occasion created some recognized duty or interest to make the communication so that it was privileged. But when you look at the communication, what Deere says that they were only going to focus on was the alleged sexual harassment of Mr. Harrison by Ms. Theobert. But yet Olson and Duvall are still communicating to the other management at Deere that there's a warrant out for Andre Harrison's arrest. Clearly, they didn't have a duty to falsely report this information, that there was a warrant. In fact, by 7.30 in the morning of August 31st, Mr. Harrison sent an email to Mr. Olson after he was told by Mr. Olson to go clear this all up, that there was no warrant for his arrest. And so under the Kuwix decision, it says an abuse of the qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties. There was no limitation of the scope by falsely reporting the existence of a warrant when it doesn't exist to management at Deere, telling Mark Digny, the investigator who was told not to even investigate the issues relating to that, that there is this existence of a warrant for Mr. Harrison's arrest. Within the investigation of the company, the only people notified of this were the necessary individuals that they report to, is that right? Correct. And this was within the scope of the investigation? No, it wasn't. They were told at the get-go that they were going to investigate that. Who told this person not to investigate anything? It's in the record, Your Honor, but Mr. Digny was told by Mr. Chisholm, Jeff Chisholm, the head of security, that that's a law enforcement issue, we're not going to investigate that. Thank you. Focus your investigation on the allegations between Harrison and Theabert. But yet, in the course of doing the investigation... ...and only communicating that to the necessary parties within the chain of investigation. Well, we're not... Within the scope of the Deere company policy. It's not the scope of the Deere company policy, it's the scope of the law. The privilege exists only when you limit your scope. And they didn't... Olson didn't do that with Digny in this situation. He told them a false fact, that there's an existing warrant for Andre Harrison's arrest. Without doing any investigation, without being told that morning that that allegation was completely false, because Andre Harrison reported that to him at 7.30. Yet he goes ahead and pollutes the mind of the investigator by telling them later that day that there's a warrant existing for his arrest. And that investigator isn't... Is he the guy at Deere Worldwide? Well, Chisholm is Worldwide Director for Security. Mark Digny works two levels below him. But he was... One person reports it to another investigator, and then it is that person's job to go out and investigate whether or not this is what occurred. And then that person... In other words, in the scope of the investigation, the person that begins or does anything doesn't have to necessarily prove every fact to be true before he passes on to the next level in the scope of the investigation. But Mr. Olson isn't an investigator. Mr. DeVolt isn't an investigator. They are the ones reporting the false fact to the investigator. Who then can either confirm or deny or find... Either can go out and investigate and find out, A, it's true, or B, it's not. Isn't that the way investigations work? Correct. But the fact of the matter is, is that these statements aren't privileged. Thank you. Counsel, you may argue. Good afternoon, Your Honor. My name is Nina Stillman, and I'm counsel on behalf of eight, not seven, of the Deere management defendants. There is another defendant in this lawsuit, Sean Maddox, who is the hourly employee, who is represented separately, and he went to trial. There's a separate appeal Mr. Harrison has brought for him. So there are a total of nine defendants in the case. I would also like to introduce the court to my colleague, Mr. Boren, and counsel. Hello. Your Honor, as Mr. Feeweeger has noted, plaintiff clearly was on an upward trajectory at Deere. He had been a number of promotions. He had been mentored by senior members of the staff. He had been sent to a Harvard executive program. What happened, Your Honor, was that the undisputed facts show it was his colossally poor judgment that led to his termination. There is no defamation here, and there is no intentional interference. I would like to just make clear, because listening to counsel's argument, there's a blurring here that there are eight distinct defendants here, and that each defendant, a case has to be proved against each of those defendants. And I would request that Your Honor think about counsel's argument. There is no real parsing out of who did what. Just to address first the defamation claim, there are only two defendants of the eight for which there are defamation claims. That's Mr. DeVault and Mr. Olson. These were the two operations managers, and one of the things that Your Honor's obviously saw was that the eight defendants fall into three buckets here. There are the two operations managers, there are the three members of worldwide security who did the investigation, and then there are the three human resources individuals. Mr. Olson and Mr. DeVault, the two operations managers, are the ones for whom there's a defamation claim. I'm not going to take the Court's time in the brief time we have to address the argument that we made in our brief, that in fact nothing that they said even rises to defamation as a matter of law, because all they said was it was reported or it was alleged that this had occurred. But as I say, Your Honor certainly have read the briefs and can see that argument there. So what I'd like to really turn to is in many ways the issue of whether they abuse the privilege, because counsel doesn't really contest that there is an issue that normally the communications from the managers to the worldwide security, which is vested dear with the responsibility for doing investigations of claims of this kind, that that would be a privileged communication. We submit, Your Honor, that nothing Mr. DeVault or Mr. Olson did shows any kind of reckless conduct that would show an abuse of the privilege. All Mr. DeVault did, who, Mr. DeVault was in Germany. He received the word of the allegations brought by Sean Maddox, and he called his subordinate, Mr. Olson, said, I've heard about these claims by Mr. Maddox against Mr. Harrison. I'm in Germany. You take care of this and deal with this, reporting it to the appropriate people. That's the sum and substance of Mr. DeVault's involvement. Mr. Olson, in turn, spoke to only two people. He spoke to Mr. Harrison himself the next morning to say, this allegation's been made against you. Please stay off work and work from home and see what's going on, try to get it cleared up. And he contacted worldwide security, which he is obligated to do when you receive a serious complaint of this kind or a serious allegation. And the important thing here also is that it wasn't just Sean Maddox reporting what had happened to his daughter over the weekend. And it's significant that there was a police report, despite the fact that Mr. Harrison said there was not. And that she had had a rape kit, the police had been with her. So there was something here. Mr. Olson reports this to worldwide security, and they follow their responsibilities. The head of worldwide security, Mr. Chisholm, gets Mr. Digny to do the investigation. Mr. Digny was an experienced investigator. He came from law enforcement, and he proceeded with the investigation. Also, fully in accordance with DEAR policies and practices, worldwide security notified human resources. That's how Ms. Martin gets into the case as a defendant. She alerts her two colleagues, Mr. Addington and Mr. Hornbuckle. So these are the eight defendants. Each of them was acting in connection with this investigation in a role that was part of their responsibilities. So I would submit that nothing Mr. Olson did in terms of reporting this to worldwide security constituted defamation. And while it wasn't clear from Mr. Beweger's argument this afternoon, it's certainly clear from the plaintiff's brief, the appellant's brief, that the position they're taking as to why it was defamation and why the privilege was recklessly abused was because Mr. Olson himself did not do an investigation before reporting this to worldwide security. And that's clear from the appellant's brief. We would submit, Your Honor, that Mr. Olson is not the appropriate person to do that investigation. He is not trained to do it. And as a corporation the size of DEAR cannot have individual operations managers doing their own investigations, especially when they're not trained to do it, because the company needs to have some system for having these kinds of claims reported and reported to those very persons at the company who are responsible for and trained to look into it and investigate. So I would submit, Your Honors, that there is no defamation claim here involving Mr. DeVault and Mr. Olson, which gets us to the intentional interference claim, Your Honor. Your Honors, I'm not going to take your time this afternoon to address the issue that's set forth in our brief with regard to the preemption by the Illinois Human Rights Act. We believe that it's clear from the complaint and indeed the plaintiff's own writings that the predicate for his intentional interference for showing malice, which we will show is the critical element that he needs to establish here, was that two of the defendants, Mr. Hornbuck and Mr. Addington, had a prior encounter with him six years earlier. And that's the predicate for the malice. If that were the case relating, by the way, to a race discrimination claim that Mr. Harrison had filed six years earlier. Indeed, Your Honor, if that was the case and this was retaliation for that, we would argue that the Illinois Human Rights Act preempts a common law claim for intentional interference. And that argument is set forth in our brief. What I would like to then address, Your Honor, is the question of whether any of the eight Deere defendants acted maliciously and solely for their personal interests and against the interests of Deere. Because that is what plaintiff needs to show if he is to establish intentional interference here. The courts recognize as a general rule that employees acting on behalf of an employer cannot be held personally liable for interfering with a plaintiff's business relationship with that employer. So therefore, each of the eight defendants has to have been shown to have acted solely for his or her personal reasons and maliciously. We would submit, Your Honors, that there is nothing in this record that even remotely is a fact showing that any of these defendants acted maliciously with respect to the plaintiff. Indeed, the plaintiff himself, throughout the record and in his complaint, at most refers to, again, Mr. Addington and Mr. Hornbuckle only, two of the eight. And there, its predicate is solely his belief, based totally on speculation, no facts, that they carried some animus for the last six years and therefore tried to get him terminated when this issue came up about his involvement with subordinates. Your Honors, first of all, the record is undisputed that neither Mr. Addington nor Mr. Hornbuckle in any way influenced Mr. Digney's investigation. That was conducted by a completely different department, Worldwide Security, and there is nothing in this record, and indeed the plaintiff admitted in his deposition, that he has nothing to show that they influenced the investigation. It's also clear that the plaintiff has offered nothing in this record to implicate in any way or to show any kind of malicious intent with respect to Mr. Chisholm, Mr. Brockway, Mr. Digney, Mr. Olson, or Mr. Duvall. I keep thinking I'm bleeding somebody out. And Ms. Martin, and Ms. Martin. In fact, Mr. Digney never even met the plaintiff before. He was assigned this investigatory job, and the first time he met the plaintiff was when he interviewed him. So there is nothing here to show that any of these people had any malice towards the plaintiff, and the plaintiff cannot bootstrap his speculation about a retaliatory motive from six years earlier that he attributes only to Mr. Addington and Mr. Hornbuckle to find malice with respect to the remaining six defendants. Your Honor, the argument about the concern from six years earlier also belies logic. I mean, even in a pristine retaliation case, that length of time usually breaks any nexus for the purpose of retaliation. But here, there's evidence that Mr. Hornbuckle, for example, had been a mentor to Mr. Harrison, had helped him in those six years to move up, to move out of human resources into an operations career path. As to the investigation itself, Your Honor, it's very clear that this was a well-done investigation. As I say, Mr. Digney was a professional, and he had worked for many years in law enforcement. There is simply nothing here to suggest that in any way these employees acted for their own purpose and against Deere's interests. And indeed, they all acted totally in accordance with Deere's policies. So I would request, Your Honor, that you, in fact, affirm the district court below, finding that there is no defamation by Mr. Olson or Mr. Duval, and finding that the eight management defendants did not act maliciously or solely for personal reasons against Deere's interests. When they carried out the duties they were supposed to do in conformance with Deere's policy by responding to a report that Mr. Harrison may have been sexually harassing a subordinate and carrying that through in a professional manner. In the time I have left, I would just like to address a couple of points that Mr. Feweger made. First of all, to correct the record, he referenced that Mr. Hornbuckle and Mr. Addington made the recommendation for the termination. In fact, the record is undisputed that they did not. The recommendation came from Ms. Martin solely to Mr. Everett. Mr. Feweger also said that this whole theory for terminating Mr. Harrison was created out of whole cloth. This simply is not the case, and in fact, the record is undisputed. And I would draw Your Honor's attention to the Martin affidavit as well as to the Everett affidavit, in which Ms. Martin clearly in her recommendation to Mr. Everett pointed out that other managers at Deere had in fact also been terminated for the poor judgment associated with having a sexual relationship with a subordinate. Counsel, you have two minutes. Thank you. As to Mr. Feweger's comment about the Section 9 of the Illinois Personnel Records Review Act, Your Honor, I would submit that that is a complete red herring. The Illinois Personnel Records Review Act does not apply to individuals. It only applies to employers, and the only defendants here are the eight individuals. Finally, I would respond to Mr. Feweger's comment about the applicability of the Cuick case. In Cuick, the very thing that didn't happen here happened, and that is company policy said the decision had to be made by both, in that case, the medical department and the legal department. What happened was is that the legal department didn't make the decision. It relied solely on the medical so that the company's policy had been violated, and as a result, the defamation occurred. Here, everybody did what they were supposed to do in accordance with policy. So Cuick is an opposite, and I would suggest, Your Honors, that the case that really is opposite here is the Vickers v. Abbott case, which is a case that is almost directly on all fours, was a summary judgment in favor of the employer on the very claims, in certain senses, very similar to what we have here. That's a Vickers case. Vickers v. Abbott, yes. So unless there are any questions, thank you, Your Honors. Thank you, Counsel. Counsel. Let's start backwards from the last argument. The court needs to look at the Gibson v. Philip Morris case, and in that case, a managerial employee was falsely accused of misrepresenting his time, and his supervisors were doing that without conducting a reasonable investigation and then representing up the chain of command that the manager did that. It was completely false, and the privilege didn't apply in that situation, or it was abused in that situation where you could establish facts showing that the person making the false statement failed to conduct a reasonable investigation into the truth or accuracy of those statements. And in this case, we have that here. We have Mr. Olson confronting Mr. Harrison the morning of August 31st saying there's an arrest warrant for you. Mr. Harrison says there is not. In fact, I'll prove it to you, and I'll go and check with the source, and there isn't one, and he emails him back and says there is no warrant for his arrest. But Olson still, after that fact, doesn't do his own investigation, as Kuwik says you should. The Supreme Court said that when you're on notice of that, that you have a duty to do a reasonable investigation, and that there's an abuse of the privilege then at that stage, which becomes a question of fact for the jury, not on summary judgment. And in this situation, Mr. Olson admits he did no investigation, yet he told Mark Digny, the investigator, later that day that there was a warrant out for Mr. Harrison's arrest. You said they were told there was a warrant out? No, he said, if you look at the record, Your Honor, Mr. Digny was specifically asked. He had his investigation report. Now, I want to get this correct. If you look at C1406, Mark Digny specifically included in his investigation report, Harrison had a warrant for his arrest. It didn't say he was told that. That was what he said in the report. And then I asked him where he got that information. Mr. Olson must have told me that. Digny, page 113 of his deposition, which is C1039, is a question of fact on the abuse of the qualified privilege if it exists in this situation. I submit that the privilege doesn't exist at all because neither Deere nor any of its supervisory employees were told to investigate the criminal charges, period. So why would Mr. Olson have any duty at that stage to report to the investigator the existence of this alleged crime? Well, didn't this all start, didn't this all begin with the report from one of the defendants that your client raped his daughter? Right. But that's not the subject here of this appeal at this point, Your Honor. No, I understand. That part it isn't. But I'm saying that was the genesis of this whole investigation, right? But when you look at the report, the report prepared by Mr. Digny, it doesn't couch it in terms of, and Mr. Olson told me that he had a report from somebody that there was a warrant for his arrest. The statement was that there was a warrant for his arrest contained within the investigation report, and Mr. Digny He was telling that to an investigator. Right. And that's still not privileged because it's not true, and he knew it wasn't true. He knew by the time he was telling the investigator that there was a reasonable doubt as to the accuracy of that statement, but yet he still told the investigator that. Well, he at least knew your client at that point. One, he knew your client said it wasn't true. Correct, because he went and checked. He followed Mr. Olson's direction and went and checked and found that there was no warrant. Did he put that in his report? Who, Digny? Yeah. Digny didn't put that in the report because Olson told him that there was a warrant out for his arrest. There was also a reference in the statements by Ms. Stillman that Mr. Olson supposedly knew that there was a police report on file and that a rape kit had been done and that this had been reported to Digny. That's nowhere in the record. The only thing that's in the record was the fact that Mr. Olson was telling the investigator after the fact that there was affirmatively a warrant out for Mr. Harrison's arrest. I'd ask the court to look at the Duomo v. Consolidation Coal case, 17th District case. That sets forth the issue of defining what malice is, the unjustified conduct. In this situation, to report to the decision maker that we have this policy to terminate managers for off-duty sexual affairs is not in the best interest of the corporation. It's something that, in my opinion, still violates Section 9 of the Personnel Records Review Act. A managerial employee can't tell the employer to go violate the law. That's unjustified. Thank you. Thank you, counsel, for your arguments. This court will take this case under advisement.